[Cite as *State v. Adams*, 2026-Ohio-2613.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 115772 |
| v. | : | |
| D'ANDRE ADAMS, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 9, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-25-702576-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Lucas Kirkland, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Michael V. Wilhelm and Nathaniel J. McDonald, Assistant Public Defenders, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant D'Andre Adams ("Adams") appeals his convictions for felonious assault, discharge of a firearm upon or over a public

roadway, and having weapons while under disability. He raises the following assignments of error for review:

**Assignment of Error I:** The State of Ohio did not present sufficient circumstantial evidence that any bullet passed over a public roadway nor does any reasonable inference exist, even in the light most favorable, that justifies [Adams's] conviction for discharge of a firearm over a roadway.

**Assignment of Error II:** [Adams's] felonious assault conviction was against the manifest weight of the evidence because the State's only evidence was the alleged victim's testimony and he was not credible.

{¶ 2} For the reasons set forth below, we affirm Adams's convictions.

## I. Facts and Procedural History

{¶ 3} In June 2023, Adams was charged in a four-count indictment, stemming from a shooting at a gas station wherein D.B. ("D.B."), a 15-year-old male, was shot in the neck. Count 1 charged felonious assault (deadly weapon), Count 2 felonious assault (serious physical harm), Count 3 discharge of a firearm upon or over a public roadway, and Count 4 having weapons while under disability. Each count contained one- and three-year firearm specifications. Adams pled not guilty and after numerous pretrials, the case proceeded to jury trial.

{¶ 4} The following is a summary of the evidence adduced at trial.

{¶ 5} D.B. testified that in the early morning hours of May 21, 2023, he was driving around with "a boy named Leon" and three girls. (Tr. 160.) D.B. was seated behind the front-passenger seat closest to the window. He said they were "drunk driving around the street," when they decided to stop at a gas station to get food. (Tr. 160.) After they pulled into the parking lot of the gas station, Leon started to do

"doughnuts" in front of the gas pumps. (Tr. 160.) During the second "doughnut," D.B. heard multiple gunshots. He testified that everyone ducked as Leon drove out of the lot.

{¶ 6} After they left the gas station parking lot, they discovered that D.B. had been shot in the neck. He testified that his jaw was numb and it was "hanging." (Tr. 163.) D.B. told Leon to drive him "back to [his] peoples." (Tr. 163.)

{¶ 7} When they arrived at the requested location, another "kid named Elijah" put D.B. back in the vehicle and drove him to the Cleveland Fifth District Police Department, where police treated D.B. and called for medics.[1] D.B. was transported to the hospital for treatment.

{¶ 8} D.B. testified that the bullet went through his neck and throat, lodging in his jaw, where it remains. He testified that his jaw was broken and the bullet knocked out teeth. D.B. had metal plates and screws in his mouth for approximately one year. He also testified that no one in his vehicle had masks on their faces.

{¶ 9} On cross-examination, D.B. admitted to drinking alcohol prior to the shooting. He also admitted that he knew he was riding in a stolen vehicle. D.B. testified that a passenger in the vehicle was hanging out of the window yelling "Woo," when they were doing "doughnuts." (Tr. 175.) He denied having a gun, and he testified that he did not see anyone in the vehicle with a gun. D.B. admitted that Leon drove D.B. and Elijah to the police department and left in the stolen vehicle.

---

[1] Elijah was subpoenaed to testify on behalf of the State but invoked his Fifth Amendment right to remain silent. Even after being advised that the Fifth Amendment did not apply, Elijah refused to testify.

{¶ 10} On redirect, D.B. testified that no one from his vehicle threatened anyone at the gas station and that they were just going to get food. He also testified that he asked to go to his "peoples" house, instead of the hospital, because he thought he was going to die and he wanted to be around his "peoples" when he died. (Tr. 182.)

{¶ 11} Cody Hutchison ("Hutchison"), who was employed as a Cleveland police officer at the time of the shooting, testified that he was on duty the evening of the shooting. At approximately 2:47 a.m., D.B. approached Hutchison in the Fifth District parking lot, holding his neck. Hutchison testified that it was difficult to understand D.B. but Hutchison stated that D.B. kept repeating that he got shot at the gas station. He observed the gunshot wound to D.B.'s neck. Hutchison called EMS and attended to the wound while trying to keep D.B. calm. Hutchison's bodycam video was played for the jury. (State's exhibit No. 4.)

{¶ 12} Cleveland Police Detective Angela Owens ("Det. Owens") testified as to her investigation of the shooting. Specifically, she explained how she acquired video footage from the Cleveland Police Department's Real Time Crime Unit that monitors all the cameras in the City of Cleveland. Det. Owens identified State's exhibit No. 5, which is video footage showing the vehicle D.B. was riding in, enter the gas station parking lot, rapidly drive in a circle, and then exit onto St. Clair Avenue. Additionally, in this video, Adams can be observed shooting towards the vehicle as it exits the parking lot.

{¶ 13} After retrieving that video, Det. Owens visited the gas station where the shooting occurred, which was located at the corner of East 140th Street and St. Clair Avenue in Cleveland. She obtained video footage from inside the gas station (State's exhibit No. 6), as well as video footage from outside the gas station (State's exhibit No. 7). Det. Owens was able to identify Adams as the shooter from these videos. She testified that the vehicle was never recovered and that she did not speak with D.B. or anyone else in the vehicle or anyone who was at the gas station during the shooting.

{¶ 14} In State's exhibit No. 6, which was played for the jury, Adams can be observed in the store making a purchase. State's exhibit No. 7 was also played for the jury. That video depicts the vehicle that D.B. was riding in, doing one tight circle and attempting to drive a second circle, when Adams can be observed stepping towards the vehicle, and "raising a gun from his . . . thigh and letting off several rounds." (Tr. 233.) When asked how many shots were fired, Det. Owens responded, "A lot." (Tr. 233.) Approximately, eight or nine muzzle flashes can be observed coming from the gun Adams is firing. (State's exhibit No. 7.)

{¶ 15} The State rested upon its exhibits being admitted.[2] Adams moved for a Crim.R. 29 dismissal of all counts. The State opposed and arguments ensued. The trial court denied Crim.R. 29 dismissal on all counts except Count 3, discharging a firearm upon or over a public roadway, and the trial court held the ruling in

---

[2] A still photo from a YouTube video was substituted and admitted as State's exhibit No. 8 upon request of the court.

abeyance.  Before the start of the defense case-in-chief, the trial court denied dismissing Count 3.  The defense called one witness.

{¶ 16}  Adams testified on his own behalf.  He explained that on the evening of the shooting, he attended a family barbecue but had arrived late and no food remained.  Adams testified that he eventually left the barbecue and stopped at the gas station with several other partygoers to order food.  He ordered a sandwich and then went outside to wait for his food to be prepared.

{¶ 17}  According to Adams, he was speaking with friends who were parked at a gas pump when he heard tires screeching and someone from the vehicle yell, "Get the f*** out of here." (Tr. 287.)  He testified that he thought he was going to be shot, so he asked his friend for his gun.  Adams explained that he noticed the vehicle was a Kia and that the "Kia Boys" are known for robbing, shooting, and killing people.  (Tr. 288.)  He said he was approximately 30 feet from the vehicle, and although the vehicle was traveling quickly, he was able to see that the people inside had masks and guns.  He testified that he was scared and he thought they were going to shoot him and his friend, so he shot at the vehicle.  Adams stated that the driver wore a ski mask, the front passenger had a gun, and the back passenger wore a ski mask and had a gun.

{¶ 18}  Adams testified that it felt like "déjà vu," referring to the time his brother was shot and killed at a house party and the time Adams was shot in the back during a drive-by shooting while he attended a funeral.  (Tr. 293.)  He also explained that the gas station was located in a high-crime area and that he had felony

convictions. Adams stated that he thought this was another drive-by shooting and he feared for the safety of himself and others.

{¶ 19} On cross-examination, Adams admitted that at the time of the shooting he was on probation. When reviewing the video evidence, he explained that he stepped towards the vehicle "to see what was going on." (Tr. 304.) Adams acknowledged that the video shows him shooting at the vehicle as it is leaving the gas station parking lot. He stated that he shot at the vehicle when it was facing away from him because he thought the vehicle was coming back. He insisted that the passenger windows were down. Adams admitted that he shot more than five times but denied emptying the clip even though the video shows at least eight shots being fired by Adams.

{¶ 20} The jury returned a guilty verdict on Counts 1, 3, and 4 and the accompanying firearm specifications. Adams was found not guilty of Count 2.

{¶ 21} The trial court sentenced Adams as follows: a mandatory three years in prison for the firearm specification in Count 1, which was ordered to be served prior to and consecutively with a minimum of two years and a maximum of three years in prison on Count 1, felonious assault (deadly weapon); a mandatory three years in prison for the firearm specification in Count 3, which was ordered to be served prior to and consecutively with nine months in prison on Count 3, discharge of a firearm upon or over a public roadway; a mandatory three years in prison for the firearm specification in Count 4, which was ordered to be served prior to and consecutively with nine months in prison on Count 4, having weapons while under

disability. The firearm specifications in Counts 1 and 3 were ordered to be served consecutively. All underlying counts were ordered to be served concurrently for a total of eight to nine years in prison. A mandatory minimum of 18 months up to a maximum of 3 years of postrelease control was ordered. Adams was credited with 122 days of jail time. All fines and costs were waived.

{¶ 22} Adams filed a timely appeal.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 23} In Adams's first assignment of error, he asserts that there was insufficient evidence to infer that a bullet passed over a public roadway because there was no forensic or circumstantial evidence showing that a bullet passed over the public roadway. The State, on the other hand, argues that the evidence shows Adams firing numerous shots from the gas station parking lot towards the vehicle as it was exiting onto St. Clair Avenue. The State contends that a jury could reasonably infer that any one of the bullets missed the vehicle and traveled over the public highway.

{¶ 24} When reviewing the sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The test for sufficiency requires a determination of whether the prosecution met its

burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.).

When performing a sufficiency inquiry, an appellate court does not assess whether

the State's evidence is to be believed but whether, if believed, the evidence admitted

at trial supported the conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387

(1997); *Jenks* at paragraph two of the syllabus. A sufficiency-of-the-evidence

argument is not a factual determination, but a question of law. *Thompkins* at 386.

### 1. Discharge Over a Public Highway

{¶ 25} Adams was convicted of violating R.C. 2923.162(A)(3), which states

that "[n]o person shall discharge a firearm upon or over a public road or highway."

{¶ 26} The trial court advised the jury as follows:

> "Public road" means public roads, highways, streets, avenues, alleys,
> and bridges within a political subdivision. "Public road" does not
> include berms, shoulders, right-of-ways, or traffic control devices.
>
> "Highway" means the entire width between the boundary lines of every
> way open to the use of the public as a thoroughfare for the purpose of
> vehicular travel.

(Tr. 360.)

### 2. Direct and Circumstantial Evidence

{¶ 27} The elements of an offense may be proven by direct or circumstantial

evidence. *State v. Wingfield*, 2019-Ohio-1644, ¶ 51 (8th Dist.). Indeed, the Ohio

Supreme Court recently reiterated that

> [s]ufficiency-of-the-evidence review is not limited exclusively to
> testimony and other forms of direct evidence. *See State v. Dunn*, 2024-
> Ohio-5742, ¶ 28, 32, 177 Ohio St. 3d 555, 253 N.E.3d 117. We regularly
> consider circumstantial evidence, which is "'sometimes defined as
> proof of facts by direct evidence from which the trier of fact may infer
> or derive by reasoning other facts in accordance with the common

experience of mankind,'" *State v. Roberts*, 2025-Ohio-5120, ¶ 140, quoting *State v. Griffin*, 13 Ohio App.3d 376, 377, 13 Ohio B. 458, 469 N.E.2d 1329 (1st Dist. 1979), in sufficiency-of-the-evidence review. *See, e.g., Dunn* at ¶ 35-37. We have also emphasized that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," *Jenks*, 61 Ohio St.3d at 272, and — in practice — "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence," *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991), citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). Our precedent thus makes clear that an appellate court does not conduct proper sufficiency-of-the-evidence review if it turns a blind eye to circumstantial evidence in the record.

*Staet v. Seymour*, 2026-Ohio-1249, ¶ 18. Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). Circumstantial evidence is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* Direct and circumstantial evidence are of equal evidentiary value. *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

{¶ 28} Ohio law, however, generally precludes the stacking of inferences to prove a claim. *State v. Brown*, 2018-Ohio-3674, ¶ 19 (8th Dist.), citing *Estate of Bier v. Am. Biltrite*, 2012-Ohio-1195, ¶ 22 (8th Dist.). "'An inference which is based solely and entirely upon another inference, and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and is universally condemned.'" *State v. Jackson*, 2025-Ohio-109, ¶ 27 (8th Dist.), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus; *State v. Wilborn*, 2024-Ohio-5003, ¶ 52 (8th Dist.).

{¶ 29} Adams asserts that in order to uphold convictions for violations of R.C. 2923.162(A)(3), there must be physical or forensic evidence available to make the inference that the bullet traveled across a public roadway. He cites *State v. Holliman*, 2025-Ohio-1262 (8th Dist.), where a witness testified that there was a fresh bullet hole found in a home across the street from the shooting, and *State v. Maldonado*, 2021-Ohio-1724 (8th Dist.), where shell casings were found in the street in the location that the defendant was standing when he was shooting. Adams's assertion is incorrect. Although physical and forensic evidence is one way to prove the element in question, it is neither required, nor is it the only way to prove that a bullet traveled over a public roadway.

{¶ 30} In *State v. Spates*, this court found sufficient evidence to uphold a conviction for discharging a firearm over a public roadway, even though shell casings were not recovered from the crime scene. *Spates*, 2015-Ohio-1014, ¶ 65 (8th Dist.). This court stated that "lack of physical evidence is not fatal to the state's case during Crim.R. 29 consideration." *Id.* at ¶ 65. At trial, one witness testified that she observed Spates shooting a firearm across the street, and another witness testified that she observed Spates running towards a field and shooting across the street. *Id.* at ¶ 66. This court found that when viewing the evidence in the light most favorable to the State, there was sufficient evidence that Spates fired a weapon across a roadway. *Id.* at ¶ 68.

{¶ 31} Adams also argues that although the State asserted that bullets do not stop right at the parking lot, "[i]t is just as reasonable to infer that every single bullet

struck the [vehicle before it entered the public highway]." (Adams's brief, p. 6.) However, that is viewing the evidence in a light most favorable to the defendant, which is not the standard. Furthermore, "[t]he state is not required to eliminate all possibilities regarding interpretations of the evidence to meet the sufficiency standard." *State v. Powell*, 2003-Ohio-4936, ¶ 15 (8th Dist.).

{¶ 32} The evidence at trial established that State's exhibit No. 5 was retrieved from Cleveland's real-time cameras located on St. Clair Avenue across the street from the gas station. As stated previously, this video evidence shows the vehicle entering the gas station parking lot from East 140th Street, driving in a circle, and speeding out onto St. Clair Avenue. From this camera angle, Adams can be observed facing towards the camera and aiming the gun in the direction of the camera, which was also the direction that the vehicle was travelling in when Adams fired multiple shots. This video also captures multiple muzzle flashes from Adams's gun, which further supports the conclusion that the bullets were traveling in the direction of the camera, which was across St. Clair Avenue. Although the gas station is private property, St. Clair Avenue is undoubtedly a public roadway for purposes of the statute.

{¶ 33} Additionally, State's exhibit No. 7 captures the shooting from the gas station looking out towards East 140th Street. The video footage depicts Adams aiming the weapon over the vehicle he is standing behind and firing it numerous times towards the vehicle and St. Clair Avenue. This video also captures eight or nine muzzle flashes from a side angle.

{¶ 34} In a similar case, *State v. Williams*, 2025-Ohio-2593 (8th Dist.), the appellant argued that there was no evidence that shots were fired over a public roadway, but rather that "any shots fired would have gone down the sidewalk." *Id.* at ¶ 32. This court disagreed stating that the video evidence showed individuals, including Williams, shooting wildly while in a gas station parking lot and on the sidewalk adjacent to East 146th Street. This court concluded that "[t]he shots were from various angles, and a jury could conclude that shots were fired over the roadway." *Id.* at ¶ 68.

{¶ 35} Although Adams seems to argue that he did not miss the vehicle, the four other occupants in the vehicle remained unscathed, and only one of the eight or nine bullets was accounted for because it is lodged in D.B.'s neck. Therefore, when viewing the evidence in a light most favorable to the State, any rational trier of fact could find that any one of the eight or nine bullets traveled across St. Clair Avenue because that is the direction that Adams fired his weapon when trying to shoot the vehicle.

{¶ 36} Accordingly, Adams's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 37} In Adams's second assignment of error, he alleges that his felonious-assault conviction is against the manifest weight of the evidence because the State did not disprove Adams's self-defense claim.

{¶ 38} "[A] manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, 2009-Ohio-3598, at ¶ 13, citing

*Thompkins*, 78 Ohio St.3d at 390. When reviewing a manifest-weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 39} As this court has previously stated:

The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2022, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.). Thus, our focus is to determine whether the prosecution has met its burden of persuasion and whether this is the exceptional case in which the evidence weighs heavily against the conviction.

### 1. Felonious Assault

{¶ 40} Adams was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which states that no person shall knowingly cause physical harm by means of a deadly weapon.

### 2. Self-Defense

{¶ 41} Initially we note that "self-defense is an affirmative defense, and therefore, 'a defendant claiming self-defense does not seek to negate an element of the [charged] offense but rather seeks to relieve himself from liability.'" *State v. Gardner*, 2022-Ohio-381, ¶ 21 (8th Dist.), quoting *Cleveland v. Williams*, 2003-Ohio-31, ¶ 10 (8th Dist.), citing *State v. Martin*, 21 Ohio St.3d 91 (1986). "A defendant claiming self-defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances to exempt [him] from liability." *Id.,* citing *State v. Latessa*, 2007-Ohio-3373, ¶ 51 (11th Dist.), citing *Martin* at 94.

{¶ 42} Here, Adams argues that he acted in self-defense and the State did not disprove his claim. In Ohio, a person may use deadly force in self-defense when he or she

> (1) "'was not at fault in creating the situation giving rise to the affray'"; (2) "'had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force'"; and (3) "'did not violate any duty to retreat or avoid the danger.'"

*State v. Wilson*, 2024-Ohio-776, ¶ 20, citing *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Nevertheless, "a person

has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B).

{¶ 43} "[W]hen a defendant presents evidence that tends to support that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another." *State v. Warth*, 2023-Ohio-3641, ¶ 29 (1st Dist.), citing R.C. 2901.05(B)(1). The State then must "disprove one or more of the elements of self-defense." *Id.*, citing *State v. Mitchell*, 2023-Ohio-2604, ¶ 17 (1st Dist.).

{¶ 44} Adams argues that "if armed gunmen were pointing weapons at [him] and turning back towards the gas pumps, then the gunmen in the Kia created the situation. [Therefore,] the State needed to prove that the defendant lacked a bona fide belief that he was in imminent danger or the defendant violated a duty to retreat." (Adams's brief, p. 10.) He asserts that he was reacting to a perceived threat and that he is more credible than D.B.

{¶ 45} Both parties agree that the issue in question was whether Adams had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force. "The test for a bona fide belief of imminent bodily harm is both objective and subjective: whether the defendant's belief is objectively reasonable and whether the defendant subjectively had an honest belief of imminent bodily harm." *Warth* at ¶ 29, citing *State v. Moore*, 2023-Ohio-2864, ¶ 10 (9th Dist.).

{¶ 46} "'Self-defense claims are generally an issue of credibility.'" *Gardner*, 2022-Ohio-381, at ¶ 26 (8th Dist.), quoting *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.). "'Whether the state disproves any of the elements of self-defense is left to the trier of fact to decide.'" *Id.*, quoting *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 36 (8th Dist.), citing *State v. Morton*, 2002-Ohio-813, ¶ 52 (8th Dist.).

{¶ 47} In this case, Adams testified that he feared for his life based on his prior life experience, his knowledge of the "Kia Boys," his observation of masks and guns, and his belief that the vehicle would return. Whereas the State presented evidence that no one in the vehicle had guns or masks, that no threats were made, and that the occupants in the vehicle were simply "joy riding." Moreover, the video evidence clearly depicts Adams calmly stepping towards the vehicle that he was allegedly afraid of and firing numerous shots at the vehicle as it exited the parking lot. Adams even testified that he fired shots as the vehicle was driving away from him.

{¶ 48} At the close of Adams's trial, the trial court provided the jury with a self-defense instruction, which meant that the trial court concluded that Adams put forward sufficient evidence that he was acting in self-defense when he shot at the vehicle hitting D.B. The jury's guilty verdict meant that the State met its burden of persuading the jury beyond a reasonable doubt that Adams was not acting in self-defense when he injured D.B. In other words, the jury did not find Adams's testimony credible when he claimed that he feared for his life or the life of his friends. Having carefully reviewed the entirety of the evidence presented at trial, we cannot

say the trier of fact lost its way or created a manifest miscarriage of justice in finding Adams guilty of felonious assault despite his claim of self-defense.[3]

{¶ 49} Accordingly, Adams's second assignment of error is overruled.

{¶ 50} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

---

[3] At appellate oral argument, Adams asserted that under *State v. Palmer*, 2024-Ohio-539, this court is required to view whether a defendant has a bona fide belief that he was in imminent danger under a subjective standard. In other words, we are to place ourselves in the defendant's position with his history and determine whether his belief was reasonable. Adams's argument is misguided. In *Palmer*, the trial court did not instruct the jury as to self-defense because the trial court determined that Palmer did not have a reasonable belief that he was in imminent danger. *Id*. at ¶ 31. The Ohio Supreme Court reversed and remanded to the trial court for a new trial. The *Palmer* Court reasoned that the trial court cannot weigh the evidence when deciding whether to instruct on self-defense. Rather the trial court must view the evidence in a light most favorable to the defendant. The *Palmer* Court determined that when viewing the evidence in a light most favorable to the defendant, Palmer presented sufficient evidence that he feared for his life to warrant a self-defense charge. *Id*. at ¶ 29. The *Palmer* Court did not, however, eliminate the objectively reasonable prong of bona fide belief, which is at issue here.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
DEENA R. CALABRESE, J., CONCUR